# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED SECURITY FINANCIAL CORPORATION,<br><br>        Plaintiff,<br><br>vs.<br><br>FIRST MARINER BANK, et al.<br><br>        Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:14-cv-00066-JNP<br><br>Judge Jill N. Parrish |

Before the court are the following motions:

1. Defendant/Counter-Plaintiff First Mariner Bank's ("First Mariner") Motion for Summary Judgment on Plaintiff/Counter-Defendant United Security Financial Corporation's ("USF") Claims for (1) Breach of Contract; (2) Quantum Meruit; (3) Intentional Interference with Prospective Economic Relations; and (4) Conversion of an Instrument; and, for Partial Summary Judgment on its Related Counterclaims for: (1) Breach of Contract; and (2) Unjust Enrichment [Docket 81];

2. Defendant/Counter-Plaintiff First Mariner Bank's Motion to Exclude Testimony of Plaintiff/Counter-Defendant United Security Financial Corporation's Expert Christina Moore [Docket 82]; and

3. USF's Motion for Permission to File Dispositive Motion to Amended Counterclaim of First Mariner Bank [Docket 99].

As explained below, the court (1) GRANTS USF's Motion for Permission to File Dispositive Motion to Amended Counterclaim of First Mariner Bank; (2) GRANTS First Mariner's Motion for Summary Judgment on USF's claims for breach of contract, intentional interference with prospective economic relations, and conversion of an instrument under Oregon law, but DENIES First Mariner's Motion for Summary Judgment on USF's quantum meruit claim; (3) GRANTS First Mariner's Motion for Summary Judgment on its related counterclaim for breach of contract, but DENIES First Mariner's Motion for Summary Judgment on its counterclaim for unjust enrichment; and (4) GRANTS First Mariner's Motion to Exclude Expert Testimony.

## FACTS

USF is a mortgage banking company. USF originates and funds mortgage loans. In addition to originating its own loans, USF also buys loans from other lenders. Using both the loans that it purchases and the loans it originates, USF packages loans together into pools, and sells them to investors.

First Mariner is a full-service financial institution, providing a range of banking services including the origination of residential mortgage loans. First Mariner and USF entered into a Sales Agreement, dated March 16, 2011, wherein First Mariner agreed to sell a specific set of residential mortgage loans to USF. That transaction was completed without dispute.

Following the initial loan sale transaction, USF and First Mariner discussed the possibility of entering into an overarching agreement known as a Pool Correspondent Lending Agreement ("PCLA") to govern subsequent loan sale transactions between the parties. The parties' discussions were initially based on a draft version of a PCLA that USF had used with other lenders. This draft PCLA was stamped at the bottom "10/05/09 v1" and is referred to

herein as the "March 2011 PCLA." The parties exchanged red-lined versions of the March 2011 PCLA by email as they negotiated terms to which each would agree. Although a number of versions were exchanged, neither party has located or produced an executed copy of the March 2011 PCLA.

As discussions progressed, First Mariner executed an Amendment to Sale Agreement (the "Amendment") dated March 16, 2011. Although its title suggests that the Amendment related to the previously executed Sale Agreement of the same date, the Amendment instead stated that it "amends and supplements the Pool Correspondent Lending Agreement . . . executed between [the parties] dated March 16, 2011 . . . ." The Amendment modified the purportedly-executed PCLA by removing Section 5.03 and removing and replacing a definition in Section 1.21.

As negotiations continued between the parties, the subject of pair off fees[1] became a point of contention. On April 7, 2011, Linda Weir, USF's production manager, sent an email to Joseph Grinder, a Senior Vice President in First Mariner's mortgage division, asking him to sign an Addendum to Pool Correspondent Lending Agreement (the "Pair Off Addendum"). The Pair Off Addendum sought to amend the March 2011 PCLA by adding Section 2.03 titled Pair Off Indemnification which provided as follows: "If [First Mariner] fails to meet any of its delivery deadlines and consequently USF is assessed any 'pair off' fees, [First Mariner] will indemnify USF from any such fees." Mr. Grinder refused to sign the Pair Off Addendum.

---

[1] USF had committed to sell a certain dollar amount of loans to investors. USF would incur pair off fees if it failed to meet its commitment. This is a common practice in the mortgage loan investment industry. For example, Fannie Mae informs its customers that "[p]air-offs are used to repurchase all or part of a mandatory delivery commitment when customers are unable to deliver the committed dollar amount." *Whole Loan Commitment Process Overview*, at 1, FANNIE MAE (April 26, 2013) (available at https://www.fanniemae.com/content/fact_sheet/whole-loan-commitment-overview.pdf (last visited April 3, 2017)).

There are additional charges common in the mortgage loan investment industry known as roll charges. Roll charges allow a seller of loans to roll over to the following month a commitment to sell loans, thus avoiding pair off fees. Roll charges and pair off fees are referred to herein together as "pair off fees."

In the months following the initial loan sale transaction in March 2011 and while negotiations regarding the PCLA were ongoing, First Mariner would periodically send lists of loans that were available for purchase to USF. If USF elected to purchase any of First Mariner's loans, USF would prepare and send a written Purchase Advice to First Mariner containing an offered purchase price and terms, including any applicable deductions for underwriting review or escrow shortages. First Mariner would review the Purchase Advices and could object to the offered purchase price and terms. Once a Purchase Advice was approved by First Mariner, USF would electronically wire funds to First Mariner, frequently bundling loan purchases into groups and making a single bulk payment. In making these payments to First Mariner, USF withheld certain amounts from those payments to pay pair off fees. Throughout the time of its relationship with First Mariner, USF incurred a total of $616,593.00 in pair off fees owed to its investors. USF recouped $536,730.45 of these pair off fees by withholding amounts from its wire payments to First Mariner.

The Indemnification Agreement and the Robinson and Ross, Jr. Loans

On or about September 1, 2011, USF and First Mariner entered into an Indemnification Agreement in connection with the sale of five particular loans from First Mariner to USF. The Indemnification Agreement required First Mariner to buy back from USF any of the five loans that became more than sixty (60) days delinquent within the first twenty-four (24) months. Among those loans was a loan made to a borrower by the name of Ginger Robinson (the "Robinson Loan") and a loan made to a borrower by the name of James E. Ross, Jr. (the "Ross Loan"). USF alleges that the Robinson Loan became over sixty days delinquent in April 2013 and that the Ross Loan became over sixty days delinquent in June 2013. USF entered into a loan modification agreement in connection with the Robinson Loan on April 24, 2014. And USF

entered into a loan modification agreement in connection with the Ross Loan on June 2, 2015. On August 27, 2015, USF notified First Mariner of the alleged 60-day delinquency of both loans, but First Mariner refused to buy them back.

The Ulino Loan

Sometime in June 2012, First Mariner sent to USF a list of loans available for purchase. Included in this list was a loan that First Mariner had originated with borrowers Christopher and Linda K. Ulino (the "Ulino Loan"). As was customary, First Mariner included the original note for the Ulino Loan to facilitate USF's review and underwriting process. The Ulino Loan note remained with USF for nearly a year, but USF never sent a Purchase Advice for the Ulino Loan. In March or April of 2013, the Ulinos contacted First Mariner requesting to refinance their loan. Because First Mariner was trying to sell the loan to USF, First Mariner initially delayed consideration of the Ulinos' request to refinance their loan. However, First Mariner later decided to move forward with a refinance of the Ulino Loan and issued a payoff statement on May 22, 2013.

That same week, First Mariner contacted USF to advise it that the Ulino Loan was being refinanced and was no longer available for purchase and requested that USF return the note evidencing the Ulino Loan. After First Mariner advised USF of the refinance, USF began the internal process of retrieving the note to return it to First Mariner. But USF did not return the note. Instead, USF sent a Purchase Advice to First Mariner on May 28, 2013, that included the Ulino Loan. First Mariner contacted USF by phone and by email to object to the May 28 Purchase Advice because it contained the Ulino Loan. Despite these discussions, on May 29, 2013, at 4:19 p.m. USF wired funds to First Mariner, including $255,973.21 earmarked to purchase the Ulino Loan. First Mariner retained the funds earmarked for the purchase of the

5

Ulino Loan and recorded a Certificate of Satisfaction of the Ulino Loan with the county recorder's office in Lane County, Oregon.

The Lawsuit

USF filed this action on December 23, 2013, in the Third Judicial District Court for Salt Lake County, Utah, seeking damages for breach of contract, quantum meruit, intentional interference with prospective business relations, and conversion of a note under Oregon law. First Mariner removed the action to this court on January 31, 2014. USF was subsequently granted leave to amend its complaint a number of times. Attached to each version of USF's complaint was a second version of a draft PCLA stamped at the bottom with "04/25/2011 v1" (the "April 2011 PCLA"). Section 2.03 of the April 2011 PCLA is titled "Pair Off Indemnification" and contains the same language that USF had presented to First Mariner in the Pair Off Addendum, providing that "[i]f [First Mariner] fails to meet any of its delivery deadlines and consequently USF is assessed any 'pair off' fees, [First mariner] will indemnify USF from any such fees."

ANALYSIS

## I.   USF'S Motion for Permission to File Dispositive Motion on Amended Counterclaim

USF seeks permission to file a dispositive motion on First Mariner's amended counterclaim. USF argues that if it is not allowed to file a dispositive motion to the amended counterclaim, First Mariner would have an unfair advantage in the litigation. USF points out that if its motion is denied, it would be denied an opportunity to challenge the amended counterclaim prior to trial because the court granted First Mariner leave to file the amended counterclaim after the deadline to amend pleadings and after the dispositive motion deadline. Further, USF argues that allowing it to file a dispositive motion will assist the court and will not unfairly prejudice

First Mariner in any way. First Mariner opposes the motion, arguing that it is untimely and that granting it would cause undue prejudice to First Mariner and frustrate the purpose of the court's scheduling order.

Rule 16 of the Federal Rules of Civil Procedure requires the court to issue a scheduling order "limiting the time to . . . amend pleadings . . . and file motions." The scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The "good cause" standard of Rule 16 "requires the movant to show the scheduling deadlines cannot be met despite the movant's diligent efforts." *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014).

First Mariner's original counterclaim asserted three causes of action—breach of contract, unjust enrichment, and detrimental reliance. [Docket 35]. On March 23, 2016, nearly seven months after the deadline for filing amended pleadings, First Mariner filed a Motion for Leave to File Amended Counterclaim seeking to add causes of action for negligent misrepresentation and fraud. [Docket 72]. First Mariner filed its Motion for Summary Judgment on August 31, 2016—the dispositive motion deadline—seeking summary judgment on its counterclaims for breach of contract and unjust enrichment. [Docket 81]. The court granted First Mariner's Motion for Leave to File Amended Counterclaim on November 15, 2016, [Docket 90], and First Mariner filed its amended counterclaim on November 22, 2016, [Docket 93]. The court held a hearing on First Mariner's Motion for Summary Judgment on January 17, 2017. At that hearing, the court asked First Mariner what effect, if any, the filing of the amended counterclaim had on the Summary Judgment Motion as it related to the counterclaims. First Mariner represented to the court that it had no effect because the amended counterclaim added claims that were not the subject of its Motion for Summary Judgment. USF did not dispute that representation. Two days after that

hearing, USF filed its motion seeking permission to file a dispositive motion on the amended counterclaim. [Docket 99].

First Mariner argues that USF's motion is untimely. First Mariner maintains that although the court did not grant it leave to file its amended counterclaim until after the dispositive motion deadline, USF has been on notice of the contents of the amended counterclaim since March 23, 2016, when First Mariner attached the proposed amended counterclaim as an exhibit to its Motion for Leave to File Amended Counterclaim. First Mariner argues that if USF anticipated the need for a dispositive motion on the claims that First Mariner sought to add in the amended counterclaim, USF should have raised that issue even before the court granted First Mariner leave to amend. But until the filing of the amended counterclaim, USF had no reason to request an extension of the dispositive motion deadline. Any motion filed before leave was granted and the amended counterclaim was filed would necessarily have been a contingent motion, and First Mariner has cited no case law requiring the filing of a contingent motion in such a circumstance. The court will not require litigants to make such a filing.

Alternatively, First Mariner argues that USF should have brought its motion sometime during the almost-two months that passed between the filing of the amended counterclaim and the January 17 hearing. First Mariner maintains that failing to seek permission to file a dispositive motion until two days after the hearing demonstrates an undeniable lack of diligence on USF's part. USF responds that it was impossible for it to meet the deadline for filing a dispositive motion because the amended counterclaim was not filed until after that deadline. USF maintains that allowing it to file a dispositive motion to the amended counterclaim would further the interests of judicial economy because it could potentially resolve issues that are not in dispute and settle the rights of the parties without the time, trouble, and expense of trial. The court agrees

with USF that it should be granted leave to file a dispositive motion, but only as to the two counts added in the amended counterclaim.

USF seeks leave to file a dispositive motion directed to the entirety of the amended counterclaim, arguing that First Mariner's Motion for summary judgment on its original counterclaims for breach of contract and unjust enrichment is moot. "[I]t is well established that an amended [pleading] ordinarily supersedes the original and renders it of no legal effect." *Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1517 (10th Cir. 1991) (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665 (2d Cir. 1977)); *see also* 6 Federal Practice & Procedure § 1476 (3d ed.) ("A pleading that has been amended . . . supersedes the pleading it modifies . . . . Once an amended pleading is interposed, the original pleading no longer performs any function in the case . . . ."). USF argues that because First Mariner filed its amended counterclaim after it filed its summary judgment motion, the pleading to which the summary judgment motion was directed is no longer operative and the motion therefore necessarily fails.

USF is correct that the original counterclaim has been superseded with the filing of an amended counterclaim, but the claims asserted in both the original and amended counterclaims remain intact and operative. *See Marotta v. Cortez*, No. CIVA 08CV02421CMACBS, 2008 WL 5044496, at *1 (D. Colo. Nov. 20, 2008) (explaining that causes of action alleged in the original pleading but not alleged in or incorporated into the amended pleading are waived); *Small v. Young*, No. 13-CV-01075-REB-CBS, 2013 WL 5862650, at *4 (D. Colo. Oct. 31, 2013) (same). Summary judgment motions are not directed at pleadings, but at claims. Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim . . . on which summary judgment is sought."). Because the claims on which First Mariner sought summary judgment are included in both the original counterclaim the amended counterclaim, the claims and evidence

related to those claims were not affected by the filing of the amended counterclaim and First Mariner's motion is not moot.

Because First Mariner's motion for summary judgment on its counterclaims for breach of contract and unjust enrichment are not moot, USF will not be given a second chance to make a dispositive motion on those claims. Additionally, USF will not be given an opportunity to make a dispositive motion on First Mariner's third counterclaim for detrimental reliance, which was also contained in First Mariner's original counterclaim. USF was aware of these claims and the evidence related to them and had the opportunity to make a dispositive motion regarding those claims prior to the dispositive motion deadline.

Because the amended counterclaim added additional claims for negligent misrepresentation and fraud that had not previously been pleaded, neither party has had the opportunity to file a dispositive motion on the additional claims. Accordingly, both parties will be given the opportunity to file a dispositive motion as to First Mariner's counterclaims for negligent misrepresentation and fraud. Any such motion must be filed within twenty-one (21) days from the date of this order.

## II.     First Mariner's Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is genuine only if "a reasonable jury could find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014). "In making this determination, 'we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.'" *Id.* at 712–13 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000)).

A movant is not required to provide evidence negating an opponent's claim. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, the nonmoving party has the burden of "present[ing] affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)). "[A] party opposing a motion for summary judgment may not rest on mere allegations or denials to demonstrate there is a genuine issue of material fact for trial . . . ." *Sammons v. Allenbrand*, 817 F. Supp. 94, 95 (D. Kan. 1993) (quoting *Liberty Lobby*, 477 U.S. at 256). Rather, "[a] party asserting that a fact is . . . genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). *See also* DUCivR 56-1.

## A. USF's Claim for Breach of Contract

A breach of contract claim is composed of four elements: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001). USF alleges three breaches of contract by First Mariner: (1) failure to indemnify USF for pair off fees in breach of the PCLA; (2) wrongfully retaining the proceeds from the sale of the Ulino Loan and recording a satisfaction of the Ulino Loan note in breach of the PCLA; and (3) failing to repurchase the Robinson and Ross, Jr. Loans in breach of the Indemnification Agreement.

### 1) Pair Off Fees

USF alleges that First Mariner breached the PCLA by failing to meet various loan commitment delivery deadlines, causing USF to incur $616,593.00 in pair off fees.[2] First

---

[2] All but $79,862.55 of these fees have been recovered by USF by withholding funds due to First Mariner for the sale of other loans.

Mariner argues that it is entitled to judgment as a matter of law because no version of the PCLA was ever executed and even if it had been executed, it did not require First Mariner to indemnify USF for pair off fees. USF responds by arguing[3] that the March 2011 PCLA was acknowledged or ratified when First Mariner signed the Amendment to Sales Agreement, which required First Mariner to indemnify USF for pair off fees. USF alternatively argues that the parties had a contract through course of performance, course of dealing, and/or usage of trade.

The existence of a contract is a necessary element of any breach of contract claim. *Bair*, 20 P.3d at 392. "The formation of a contract requires a meeting of the minds." *Harris v. Albrecht*, 86 P.3d 728, 730 (Utah 2004). "In determining whether the parties created an enforceable contract, a court should consider all preliminary negotiations, offers, and counteroffers and interpret the various expressions of the parties for the purpose of deciding whether the parties reached agreement on *complete and definite terms*." *Nunley v. Westates Casing Servs., Inc.*, 989 P.2d 1077, 1084 (Utah 1999) (emphasis added). "Simply stated, a condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced." *Prince, Yeates & Geldzahler v. Young*, 94 P.3d 179, 183–84 (Utah 2004) (internal citation, alterations, and quotation marks omitted).

Although USF concedes that it has not been able to locate an executed copy of the March 2011 PCLA (*see* Third Amended Complaint, ¶ 13), it argues that First Mariner acknowledged or ratified the March 2011 PCLA when it executed the Amendment to Sales Agreement on March

---

[3] USF's complaint alleges that Section 2.03 of the April 2011 PCLA obligated First Mariner to indemnify USF for pair off fees caused by First Mariner's failure to meet loan delivery commitments. [*See* Docket 68, ¶ 23 ("Third Amended Complaint")]. But USF has abandoned that allegation, conceding at oral argument that there is no evidence in the record that the April 2011 PCLA was ever delivered to First Mariner or that it was ever agreed to by First Mariner.

16, 2011. But USF has offered no legal authority supporting this acknowledgment/ratification argument. First Mariner responds by arguing that, on its face, the Amendment purports to amend only the Sale Agreement and that USF has not produced (and cannot produce) an executed version of any PCLA because it does not exist and the parties never agreed to all the terms of a PCLA.

Although it is undisputed that the Amendment was executed, the court concludes that its execution does not evince a meeting of the minds as to all the terms of the March 2011 PCLA. A meeting of the minds requires that parties agree "either expressly or impliedly" to terms "with sufficient definiteness to be enforced." *Prince, Yeates & Geldzahler*, 94 P.3d at 183–84. The Amendment to Sales Agreement purports to "amend[] and supplement[] the Pool Correspondent Lending Agreement executed between the Seller and the Purchaser dated March 16, 2011," but USF has not produced a PCLA that is dated March 16, 2011. It is undisputed that the parties were negotiating back and forth as to the terms of an overarching PCLA, and it is likewise apparent on the record that at the time the Amendment was signed, the parties had not agreed on all terms. Indeed, the version of the March 2011 PCLA that is in the record contains comment boxes and editing marks that indicate that it was still a work in progress. Although the executed Amendment shows that there was a meeting of the minds as to some terms, USF has failed to present any evidence that there was a meeting of the minds as to all of the terms contained in the March 2011 draft of the PCLA. In short, USF has failed to produce evidence that the parties reached agreement on complete and definite terms and its claim for breach of contract fails as a matter of law.

Even if USF could establish that there was a meeting of the minds on all the terms contained in the draft March 2011 PCLA, First Mariner was not required to indemnify or pay the

pair off fees incurred by USF under the terms of the draft March 2011 PCLA. It is undisputed

that the March 2011 draft of the PCLA does not contain a provision specifically requiring First

Mariner to indemnify USF for pair off fees.[4] It is also undisputed that First Mariner refused to

sign the Pair Off Addendum. USF nevertheless argues that it was entitled to indemnification for

the pair off fees pursuant to Section 5.01 of the March 2011 draft of the PCLA, a provision that

requires First Mariner to indemnify USF for losses or damages incurred by USF as a result of the

actions of First Mariner. Section 5.01 provides, in relevant part:

> [First Mariner] agrees to indemnify and hold USF harmless from any and all
> liability, claims, loss or damage resulting from any act or omission of [First
> Mariner] in breach of any material representation, warranty or other provision of
> this Agreement. If any claim, action or proceeding shall be asserted or brought
> against USF by reason of any such act or omission of [First Mariner], [First
> Mariner] shall, upon demand, obtain representation by legal counsel acceptable to
> USF to defend USF against any such action and/or claim and [First Mariner] shall
> pay all reasonable costs incurred in such defense.

USF maintains that pair off fees constitute damages suffered by USF as a result of First

Mariner's breach of its duty to fulfill the commitments it made in the PCLA.

By its terms, Section 5.01 does not mention pair off fees, or any other fee or penalty.

Rather, Section 5.01 requires First Mariner to indemnify USF for liability, claims, losses, or

damage resulting from a breach of any material representation, warranty, or other provision of

the PCLA. But when asked at oral argument to point out the provision, warranty, or

representation that First Mariner breached to trigger the Section 5.01 indemnification provision,

USF was unable to do so and all of the representations and warranties in the March 2011 draft

PCLA deal only with the requirements (such as credit scores of borrowers, compliance with

regulations, etc.) for the loans and loan pools offered by First Mariner for purchase. No provision

---

[4] The April 2011 PCLA had such a provision—Section 2.03. But it is undisputed that the draft March 2011 PCLA
identified Section 2.03 as being "reserved."

in the March 2011 draft PCLA obligates First Mariner to provide a certain number of loans or loan pools to USF for purchase.[5] Additionally, if Section 5.01 required First Mariner to indemnify USF for pair off fees, there would have been no reason for USF to request that First Mariner execute the Pair Off Addendum or for USF to add Section 2.03 to the April 2011 draft PCLA attached to its complaint. In sum, even assuming that First Mariner were bound by the March 2011 draft PCLA, there is no provision in that document that requires First Mariner to indemnify USF for pair off fees.

USF alternatively argues that an agreement for the charging of pair off fees arose through course of performance, course of dealing, and/or usage of trade. This argument likewise fails as a matter of law. USF did not allege any of these alternate implied contract theories in any iteration of its complaint and makes these arguments for the first time in response to First Mariner's Motion for Summary Judgment. "An issue raised for the first time in a motion for summary judgment may properly be considered a request to amend the complaint, pursuant to Federal Rule of Civil Procedure 15." *Pater v. City of Casper*, 646 F.3d 1290, 1299 (10th Cir. 2011). But as the Tenth Circuit has held,

> Rule 15 mandates that the court grant leave to amend "when justice so requires." Fed.R.Civ.P. 15(a). As a general rule, a plaintiff should not be prevented from pursuing a claim merely because the claim did not appear in the initial complaint. *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir.1991). However, a court properly denies leave where "a late shift in the thrust of the case will [ ] prejudice the other party in maintaining his defense upon the merits." *Id.* (quotation omitted). The liberalized pleading rules do not allow plaintiffs "to wait until the last minute to ascertain and refine the theories on which they intend to build their case." *Id.* at 1091. In addition, "untimeliness alone is a sufficient reason to deny leave to amend . . . when the party filing the motion has no

---

[5] After conceding at oral argument that no such provision exists in the March 2011 draft PCLA, USF represented that there were documents known as "commitments" that set out a certain number of loans or dollar amount of loans that First Mariner had agreed to sell to USF. But these "commitments" are nowhere to be found in the record.

adequate explanation for the delay." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365–66 (10th Cir.1993).

*Id.*

Through the course of this litigation, USF has relied solely on the April 2011 draft PCLA as the basis for its breach of contract claim relating to pair off fees. At this stage in the case, granting leave to USF to again amend its complaint to include these implied contract theories would be untimely because the facts giving rise to these theories have been known to USF since the initiation of this action, and the deadlines for amending pleadings and for filing dispositive motions are now past. USF's attempt to shift theories in a last minute attempt to avoid summary judgment is untimely and the court will not consider those theories.

      2)     *The Ulino Loan*

USF argues that First Mariner breached the implied covenant of good faith and fair dealing inherent in the PCLA and/or the relevant Purchase Advice by retaining the funds that USF wired to First Mariner for the Ulino Loan and recording a satisfaction of the note First Mariner had delivered to USF. First Mariner argues that no contract for the sale of the Ulino Loan was ever consummated and that it had informed USF that the Ulino Loan was no longer available to purchase before a contract was formed.

"In Utah, virtually every contract imposes upon each party a duty of good faith and fair dealing, the violation of which gives rise to a claim for breach of contract." *Oakwood Village LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1239 (Utah 2004) (citing *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199–200 (Utah 1991)). This implied covenant of good faith and fair dealing requires "each party to refrain from actions that will intentionally destroy or injure the other party's right to receive the fruits of the contract." *Id.* (quoting *St. Benedict's*, 811 P.2d

at 199) (internal quotation marks omitted). But a necessary prerequisite to the implied covenant of good faith and fair dealing is a valid contract.

As discussed above, the parties never reached a meeting of the minds regarding a PCLA. Thus, the only contract that First Mariner could have breached in connection with the Ulino Loan would be the individual Purchase Advice that included the Ulino Loan. However, by the time the relevant Purchase Advice was sent to First Mariner, First Mariner had already informed USF that the Ulino Loan was no longer available for purchase.

It is a matter of black letter contract law that an offer "may be revoked by the offeror at any time prior to the creation of a contract by acceptance." *Revocation of Offers*, 1 Williston on Contracts § 5:8 (4th ed.). And "any statement which clearly indicates or implies unwillingness on the part of the offeror to contract according to the terms of the offer is sufficient" to revoke an offer. *Id.*

The undisputed fact is that First Mariner informed USF that the Ulino Loan was no longer available for purchase before USF sent the May 28 Purchase Advice. USF attempts to dispute this fact, asserting that there is no evidence that USF was informed that First Mariner had withdrawn its offer prior to sending the Purchase Advice. In support of this assertion, USF cites to portions of the deposition of Nick Weir, USF's Secondary Marketing Manager. But the cited portions of Mr. Weir's deposition do not create a genuine dispute on this issue. The cited portions of Mr. Weir's deposition address a conversation with Mr. Grinder, First Mariner's Senior Vice President, that occurred after the wire had been sent to First Mariner to negotiate the potential return of overpaid funds. And USF's assertion that there is no evidence that it was informed of First Mariner's decision to withdraw the offer to sell the Ulino Loan until after it accepted First Mariner's offer by sending the Purchase Advice ignores Mr. Grinder's testimony.

Specifically, Mr. Grinder testified that First Mariner informed USF that the Ulino Loan was no longer available for purchase the same week that First Mariner issued a payoff statement for the Ulino Loan. Further, even if USF were not informed that First Mariner had withdrawn its offer before it sent the Purchase Advice, it is undisputed that First Mariner objected to the Purchase Advice and had not approved it before USF sent the wire to First Mariner. In short, First Mariner revoked its offer to sell the Ulino Loan before USF accepted it. Therefore, there was no contract between the parties for the sale of the Ulino Loan and USF's claim for breach of contract fails as a matter of law.

### 3) The Indemnification Agreement and the Robinson and Ross Loans

USF alleges that First Mariner breached the Indemnification Agreement by refusing to repurchase the Robinson and Ross Loans. It is undisputed that the Indemnification Agreement constitutes a valid and enforceable contract. The terms of the Indemnification Agreement required First Mariner to repurchase certain loans from USF in the event that the loans became more than sixty days delinquent in the first two years after USF purchased them. First Mariner argues that it is entitled to summary judgment because USF cannot point to any evidence in the record that either the Robinson or Ross Loans were sixty days delinquent at any time in the two years after they were sold to USF. USF responds that the Ross and Robinson loans did become more than sixty days delinquent within the prescribed period, citing to the affidavit of Linda Weir, USF's production manager, attached to USF's memorandum opposing summary judgment.

Ms. Weir testifies that within the twenty four month period, "both the Ross and Robinson loans went delinquent." But that assertion contradicts her earlier deposition testimony that she

was unfamiliar with either of those loans specifically[6] and appears to be an attempt to create a sham fact issue. Accordingly, the court disregards Ms. Weir's contrary affidavit. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001). That said, even if the court were to consider the affidavit, it does not establish that either of the Ross or Robinson loans were *sixty* days delinquent within the relevant twenty-four month period, only that they were, at some point, delinquent.

USF has failed to point to any evidence that these loans were sixty days delinquent at any point during the relevant two-year period. Thus, there is no dispute of material fact and First Mariner is entitled to judgment as a matter of law on USF's allegation that First Mariner breached the Indemnification Agreement.

### B.      USF's Claim for Quantum Meruit

USF brings an alternative claim for quantum meruit against First Mariner, asserting that First Mariner was unjustly enriched when it retained the funds that USF had wired as payment for the Ulino Loan. To prevail on a claim for quantum meruit, USF must prove that First Mariner "(1) received a benefit, (2) appreciated or had knowledge of this benefit, and (3) retained the benefit 'under circumstances that would make it unjust for [First Mariner]' to do so." *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1012 (Utah 2015) (quoting *Emergency Physicians Integrated Care v. Salt Lake Cty.*, 167 P.3d 1080, 1083 (Utah 2007)).

First Mariner argues that it is entitled to summary judgment because the undisputed facts show that although it retained the $255,973.21 that USF wired for the purchase of the Ulino Loan, it did not retain them as payment for the Ulino Loan. Rather, First Mariner argues that it

---

[6] Indeed, none of USF's witnesses were able to testify in their depositions that they had heard of and/or knew anything about the Robinson or Ross loans, let alone any alleged delinquencies.

retained the funds as a credit toward funds that USF allegedly owed First Mariner. Thus, First Mariner reasons, it never received a "benefit" from USF to support a claim for quantum meruit. First Mariner also argues that USF cannot produce any evidence that First Mariner "unjustly retained" the alleged benefit because it did not receive a windfall since First Mariner was owed money from previous transactions with USF. First Mariner's arguments are not well-taken.

First Mariner undeniably received a benefit in the form of the $255,973.21 that USF wired for the purchase of the Ulino Loan. Although the prototypical quantum meruit claim involves the provision of a service or goods to the defendant, the Utah Supreme Court has included in its definition of "benefit" "an interest in money . . . or anything which adds to [the defendant's] security or advantage." *Emergency Physicians*, 167 P.3d at 1086 (quoting *Baugh v. Darley*, 184 P.2d 335, 337 (Utah 1947)). USF wired the money to First Mariner, mistakenly believing that it would receive the Ulino Loan in return. It matters little that USF was not entitled to receive the Ulino Loan in return, or that First Mariner accepted the money for some other purpose, such as the satisfaction of another debt. First Mariner obtained a benefit when it received and kept the funds that USF had wired for the Ulino Loan.

There is also no dispute that First Mariner had knowledge of the benefit it had obtained and that it retained the benefit under circumstances that made its retention of that benefit unjust. To incur liability under quantum meruit, the defendant must retain the benefit "unjust[ly] in that the defendant received a true windfall or 'something for nothing.'" 66 Am. Jur. 2d *Restitution and Implied Contracts* § 13 (2001). *See also Emergency Physicians*, 167 P.3d at 1086. Although First Mariner alleges in its counterclaims that it is entitled to damages from USF, it was unjust for First Mariner to retain the money that USF had sent it for the specific purpose of purchasing the Ulino Loan. By retaining the money without giving something in return, First Mariner did

receive something for nothing.[7] Because First Mariner received a benefit and retained that benefit unjustly, First Mariner's motion for summary judgment on USF's claim for quantum meruit is denied.

### C. USF's Claim for Intentional Interference with Prospective Economic Relations

USF brings a claim for intentional interference with prospective economic relations. USF makes this claim for alleged interference with its relationships with the Ulinos, GNMA, and Dovenmuehle Mortgage Inc. ("DMI"), its loan subservicer. "In order to win a tortious interference claim under Utah law, a plaintiff must now prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015) (internal quotation and citation omitted). To prove "improper means," a plaintiff must "prove that defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession." *Pratt v. Prodata, Inc.*, 885 P.2d 786, 788 (Utah 1994), *overruled on other grounds*, *Eldridge*, 345 P.3d at 553.

With respect to the Ulinos, First Mariner argues that USF cannot prove the first element—that First Mariner intentionally interfered with an economic relationship—because USF never purchased the Ulino Loan from First Mariner and consequently never had an economic relationship with the Ulinos. USF does not respond to this argument, focusing exclusively on the second element and arguing that First Mariner illegally recorded a satisfaction of the Ulino Loan note. Because the court has already concluded that USF never purchased the

---

[7] Further, First Mariner conceded at oral argument that in the event that it is awarded a judgment against USF on its counterclaims, that judgment would be offset by the $255,973.21 that it retained from USF's wire.

Ulino Loan, the court also concludes that USF had no economic relationship with the Ulinos. Therefore, USF cannot succeed on its intentional interference claim with respect to the Ulinos.

With respect to GNMA, First Mariner argues that USF has failed to prove that First Mariner "intentionally" interfered with USF's relationship with GNMA. Specifically, First Mariner argues that there is no evidence in the record that First Mariner knew about USF's relationship with GNMA before this lawsuit, let alone evidence that First Mariner desired to interfere in any way with the relationship between USF and GNMA. First Mariner also maintains that even if USF could prove that First Mariner intended to interfere with USF's relationship with GNMA, USF cannot prove that First Mariner's alleged interference occurred by "improper means." In responding to First Mariner's motion for summary judgment, USF makes no argument supporting its intentional interference claim as it relates to GNMA and fails to counter any of the arguments raised by First Mariner.

Because it is an intentional tort, an intentional interference claim requires a plaintiff to show that the actor "desire[d] to bring about certain consequences." *Eldridge*, 345 P.3d at 565. *See also* Restatement (Second) of Torts § 8A (1965) ("The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act. . . .")). USF has failed to point to any evidence that First Mariner intended to interfere with USF's relationship with GNMA. Further, USF has failed to prove that First Mariner employed any improper means to interfere with its relationship with GNMA. Because USF never purchased the Ulino Loan from First Mariner, First Mariner had every right to refinance the Ulino Loan and record a satisfaction of the Ulino Loan note. Thus USF's claim for intentional interference with its relationship with GNMA fails as a matter of law.

First Mariner makes the same arguments with respect to USF's allegations of intentional interference with its relationship with DMI—that USF has failed to prove wither intentional interference or improper means. USF asserts that it was required to pay the monthly payments on the Ulino Loan because First Mariner contacted DMI and threatened litigation if it continued trying to collect payments on the Ulino Loan on behalf of USF. USF reasons that First Mariner interfered with its economic relationship with DMI when it convinced DMI to stop servicing the Ulino Loan on behalf of USF. However, because USF never purchased the Ulino Loan from First Mariner, USF and its subservicer DMI had no right to collect payments on the Ulino Loan. Therefore, First Mariner did not act improperly when it contacted DMI to request that it cease its collection efforts on the Ulinos. Thus, USF's claim for intentional interference with its relationship with DMI fails as a matter of law.

USF's claim for intentional interference with its economic relationships with the Ulinos, GNMA, and DMI fails for the additional reason that USF has failed to adduce any evidence of injury. First Mariner argues that USF cannot point to any evidence that its economic relations with the Ulinos, GNMA, or DMI have been injured as a result of First Mariner's alleged intentional interference. And USF has failed to identify any evidence of damage to respond to that argument. USF claims that it has had to make the monthly payments on the Ulino Loan note, but has not cited to any evidence in the record supporting that claim and has not indicated how those payments were the result of First Mariner's alleged intentional interference. The lack of evidence supporting the element of injury is an additional basis for concluding that First Mariner is entitled to judgment on this claim as a matter of law.

**D.      USF's Claim for Conversion of an Instrument Under Oregon Law**

USF also brings a claim for conversion of an instrument under Oregon Revised Statutes, Title 8, Section 73.0420. This claim relies on USF's allegations that First Mariner sold the Ulino Loan note to USF and that USF was the holder with an exclusive right to enforce it. But, as the court has already determined, USF never purchased the Ulino Loan from First Mariner. Therefore, USF's claim for conversion of an instrument under Oregon law fails as a matter of law.

**E.  First Mariner's Counterclaim for Breach of Contract**

First Mariner brings a counterclaim for breach of contract seeking to recover pair off fees and escrow overages that it alleges USF improperly withheld in breach of the various Purchase Advices. Although there was no overarching PCLA or other agreement governing the continued sale of mortgage loans, First Mariner argues that the individual loan sale transactions were governed by the individual Purchase Advices. The Purchase Advices contained the key terms for the transactions, including the price USF agreed to pay for each loan. First Mariner maintains that between 2011 and 2013, USF breached its obligations under the contracts by unilaterally and improperly withholding $536,730.45 in pair off fees, and by incorrectly collecting $247,000.00 in escrow account overages from First Mariner and paying that amount to DMI.

A breach of contract claim is composed of four elements: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair*, 20 P.3d at 392.

Turning first to the pair off fee issue, it is undisputed that the various Purchase Advices were binding contracts between the parties. Each of the individual purchase advices contained the key terms for the sale of pools of loans from First Mariner to USF. Specifically, the individual purchase advices contained a list of loans to be purchased and the price that USF

would pay for those loans. USF concedes that it withheld $536,730.45 from payments to First Mariner, but argues that it was not a breach of the Purchase Advices because USF was entitled to withhold that amount under the PCLA. But the court has concluded that there was no enforceable PCLA or other contract between USF and First Mariner entitling USF to withhold funds from First Mariner to pay pair off fees. Without a contractual right to charge First Mariner for those fees, USF breached the various individual Purchase Advices. USF concedes that the amount that it withheld was $536,730.45.

First Mariner also claims that USF has admitted that it improperly collected $247,000.00 of First Mariner's money as a result of overfunded escrow accounts and paid that money to DMI. Of that $247,000.00, USF has recovered $183,000.00 from DMI[8], but has not returned any of this money to First Mariner. The parties agree that the contracts between the parties govern the payment of escrowed funds in the settlement process. USF also conceded at oral argument that First Mariner is entitled to the $183,000.00 that it has recovered from DMI, but argues that it is not responsible for the remaining $64,000.00.

Although USF argues that it should not be liable for the remaining $64,000.00 that it has not recovered from DMI, it has failed to articulate a reason for that position. It is undisputed that the escrow accounts at issue were overfunded in the amount of $247,000.00. Thus, whether USF has already recovered all or some of that amount does not matter; USF is liable to repay First Mariner for the entire amount of the overfunded escrow.

Because USF had no contractual right to withhold funds from First Mariner for the payment of pair off fees that USF accrued, USF breached the various Purchase Advices, First

---

[8] DMI refunded the remaining $64,000.00 to customers and accordingly refused to reimburse the full $247,000.00 to USF.

Mariner is entitled to judgment in the amount of $536,730.45 for the improperly withheld pair off fees. First Mariner is also entitled to judgment in the amount of $247,000.00 for the overfunded escrow accounts that USF paid to DMI. These amounts should be offset by the $255,973.21 that First Mariner retained from the wire that USF sent as payment for the Ulino Loan.

**F.      First Mariner's Counterclaim for Unjust Enrichment**

First Mariner brings an alternative counterclaim for unjust enrichment in the event the court determines that the individual Purchase Advices do not represent a contract requiring USF to return the withheld pair off fees and overfunded escrow funds that USF paid to DMI. Because the court has concluded that the individual Purchase Advices do constitute contracts that USF breached by withholding funds from First Mariner for pair off fees and by improperly collecting and paying overfunded escrow accounts to DMI, the court denies First Mariner's motion for summary judgment on its alternative claim for unjust enrichment.

**III.      First Mariner's Motion to Exclude Expert Testimony**

USF designated Christina Moore to testify as an expert in this case. Ms. Moore has provided an expert report containing five opinions relating to two issues in this case. First Mariner asks the court to exclude all of Ms. Moore's testimony because it is not helpful to the jury, invades the province of the jury to apply the facts to applicable law, and is otherwise irrelevant.

Fed. R. Evid. 702 provides that an expert's testimony is admissible if, *inter alia*, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Indeed, "[t]he touchstone of admissibility under Rule 702 is the helpfulness of the evidence to the trier of fact." *United States*

*v. Hill*, 749 F.3d 1250, 1258 (10th Cir. 2014) (citation omitted). Determining whether the expert's testimony will help the trier of fact requires the court to consider the testimony's relevance, jurors' common knowledge and experience, and whether the testimony may usurp the jury's primary role as the evaluator of evidence. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006). The court is also cognizant that an expert's testimony is meant to help the fact finder determine the facts, not to make legal conclusions. *See Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007) ("While expert witnesses may testify as to the ultimate matter at issue, Fed. R. Evid. 704(a), this refers to testimony on ultimate facts; testimony on ultimate questions of law, i.e., legal opinions or conclusions, is not favored."); *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) ("The basis for this distinction is that testimony on the ultimate factual questions aids the jury in reaching a verdict; testimony which articulates and applies the relevant law, however, circumvents the jury's decision-making function by telling it how to decide the case.").

Ms. Moore's Opinions 1–4 relate to the issue of contract formation. Specifically, Ms. Moore opines that an implied contract may be formed through course of performance, course of dealing, and/or usage of trade. Because these theories were raised for the first time on summary judgment and were not plead in this case, the court is not considering them. Accordingly, Ms. Moore's opinion on these issues would not be helpful to the jury in determining a fact in issue. And even if the court were to consider those theories of implied contract formation, Ms. Moore's opinions would nevertheless be inadmissible. Opinion 1 does not assist the jury in determining any material or relevant factual issue. Opinion 1 contains Ms. Moore's opinion that USF charged pair off fees in accordance with market movement. But whether pair off fees were appropriately calculated is not at issue in this case. Rather, at issue is USF's contractual right to assess pair off

fees. And Ms. Moore's opinion on that legal issue is not admissible. Opinions 2–4 merely summarize evidence and arrive at the legal conclusion that USF and First Mariner had an implied contractual agreement whereby USF could impose pair off fees on First Mariner. But this is not the kind of expert testimony admissible under Rule 702 and the relevant case law. Instead, it is Ms. Moore's opinion as to a legal conclusion. But an expert is not entitled to opine on issues of law.

Ms. Moore's Opinion 5 states Ms. Moore's analysis and opinion regarding the liens that First Mariner recorded in connection with the Ulino Loan. The key issue regarding the Ulino Loan is whether USF legally acquired the Ulino Loan before First Mariner informed USF that it was no longer available for sale. Whether a second lien was recorded on the Ulinos' property as a result of First Mariner's refinance of the Ulino Loan is not at issue in this case. Accordingly, Ms. Moore's Opinion 5 is irrelevant and would not be helpful to the fact finder in determining a fact at issue.

### CONCLUSION AND ORDER

In accordance with the foregoing, the court HEREBY ORDERS:

1) USF's Motion for Permission to File Dispositive Motion to Amended Counterclaim of First Mariner Bank [Docket 99] is GRANTED;

   a. Both parties will be given the opportunity to file a dispositive motion as to First Mariner's counterclaims for negligent misrepresentation and fraud;

   b. Any such motion must be filed within twenty-one (21) days from the date of this order;

2) First Mariner's Motion for Summary Judgment [Docket 81] is GRANTED IN PART AND DENIED IN PART as follows:

   a. First Mariner's Motion for Summary Judgment on USF's first cause of action for breach of contract, third cause of action for intentional interference with prospective economic relations, and fourth cause of action for conversion of an instrument under Oregon law is GRANTED;

   b. First Mariner's Motion for Summary Judgment on USF's quantum meruit claim is DENIED;

   c. First Mariner's Motion for Summary Judgment on its first counterclaim for breach of contract is GRANTED;

   d. First Mariner's Motion for Summary Judgment on its counterclaim for unjust enrichment is DENIED; and

3) First Mariner's Motion to Exclude Expert Testimony [Docket 82] is GRANTED.

4) Judgment shall be entered in favor of First Mariner in the amount of $527,757.24.

Signed August 2, 2017.

BY THE COURT

Jill N. Parrish
United States District Court Judge